Your Honor, to the extent that I can, I'd like to try to reserve maybe two or three minutes for rebuttal. May it please the Court, my name is Paul Lindenmuth. I'm here on behalf of the plaintiff appellate in this case, Mary Vaughn. This is a case arising out of, or this is an appeal arising out of a case involving a disability claim brought under the Federal Rehabilitation Act relating to an employment down at the McCourt. She did get disability retirement, didn't she? She ultimately did get a disability retirement, Your Honor, though those issues were not something that were necessarily addressed during the course of the litigation, other than the fact that she felt she was forced into a disability situation as a byproduct of the Army's failure to accommodate her disability. Counsel, here's my difficulty, and maybe you can help me out. It's true that in the summer of 1999, when your client made some appointments with the EEO counselor, the counselor failed to show up. But then in 2000, when she came to the office with her husband to pick up the complaint form, she was given 45 more days to come in and have an informal attempt to resolve her complaint, and she was told that Terry Fisk would assign a different counselor to her, and yet she refused to come in. Why isn't that the end of her claim in the sense of failure to exhaust? Because if we look at the actual fact pattern here is we have to look at what actually occurred here was, one, she did make these attempts to set up a timely appointment with the EEO counselor. For whatever reasons, he did not meet with her. You know, I've taken a position in my brief that alone her efforts of contacting the EEO counselor completed her side of the equation with respect to the exhaustion question. But in 2000, she was told that wasn't the case, and she was given another 45 days. She was given additional time to engage in the informal process. In some respects, she did. And the reason why she did, if we look at the correspondence being generated out of the local EEO office, they're providing a couple things. In those correspondence, they're indicating you have not done the informal counseling process. Because you have not done the informal counseling process, we need to gather additional documentation and records. And, in fact, she did provide additional documentation and record responses. And the documents of which I speak are documents set forth in the defendant's or the appellee's excerpts or records. But she did engage in the process. And even if we assume arguendo is that they gave her an opportunity to do this, the next question is, is then what did the agency do thereafter? But isn't there a specific regulation that says that if your client wanted to bring a claim of this kind, that it's necessary to go through the counseling, informal counseling, and then to get an authority to sue letter and to sue within a certain number of days after that? If I recall correctly, the system works that you go through the informal counseling process 45 days from the alleged discriminatory act. It has to be within that time frame. Then that process is completed, and then there is an option into the formal counseling process, which requires the written complaint to be filed, which, in fact, was filed in this case. That triggers an investigation. Here, there, in fact, was an investigation done by an outside investigator. I can't remember his name. It began with an L, where they went and gathered witness statements. That information was gathered together and placed in front of an administrative law judge who was hired by the agency. The administrative law judge made a decision. From that point of that decision, we had a couple options. We could have opted into a full hearing in front of the EEOC, or we could have opted into federal court. So, yes, that's true, but it comes a little bit farther down the line where we're dealing with the alleged problem area here. The alleged problem area here is dealing with the initiation of the process, which is this 45-day period. You have to go to the informal counseling process. Now, when we look at the CFRs that are involved here, they don't do a very good job of providing us a definition of what the process is. They indicate that your obligation as the employee is to make contact with an EEO counselor. Now, in a couple ways, Ms. Vaughn made contact with the EEO counselor. She went to the EEO office and talked to Ms. Moynihan, I believe her name is, and that was discussed during the evidentiary hearing aspect, not the trial part of the case, but the evidentiary hearing. There was contact there. They understood the nature of her issues, and, in fact, there was training being provided. They were certainly working the issue. Now, there was an additional step Ms. Vaughn was told to comply with, and that was to contact one of these collateral counselors. She thought Mr. Stevens would be a good counselor. I believe they're both African-Americans, so she may have felt an affinity towards them because of the race issues involved in the case. She made repeated efforts to contact Mr. Stevens, but he would never meet up with her. Now, in the course of the telephonic contacts, she was telling them the nature of the problem. So the CFR provides two things, contact, consultation. Does it say face-to-face meeting? No. It says contact, consultation. She did that. Now, those two things occurring from her side of the equation should have triggered some activity on the part of the government. In other words, an investigative process and ultimately a generation of a report. That's my understanding. That didn't happen here. Now, what control did my client have over that? She doesn't write the report. She doesn't submit the report. We get to the February time frame here. She goes into the EEO office, says we'll give you additional time to do this investigation that's going to provide the basic information that we're going to utilize in the formal complaint process. They go ahead and do that, and then they go through this process. Now, we look at this case versus the Boyd case, which was a Ninth Circuit opinion, and we look at this case and we look at the Esther case that was relied on by the district court, and we have a situation here where she's doing everything she's supposed to do. The government seems to ignore the timeliness issue. They go through the process of the investigation. They're gathering information out of her that would otherwise have been gathered in the informal process. They could have just simply denied investigating her claims. Now, Boyd is a case where there just was simply a late filing, if I recall correctly, and they did accept it. But here we have much more going on. We have a rational basis for the government implicitly to accept these procedural defects in the process, because at the time this is occurring, we have the failure on the collateral counselor in the background. So, Mike, you've answered adequately on my question. I'll just take it to understand that you believe there was substantial compliance by her with the process to the extent she could comply and that the merits ought to be addressable. And, of course, Judge Bryan rest his decision on the waiver question. I know he did. Yeah, on the Estes and Bruce case. And, of course, we urge you to affirm on that basis on this issue. Now, with respect to the underlying case, and I have very little time here, we really have four issues. One of the issues I think is obviously the most controversial issue is the question of whether this Court should take another look at the Kaplan case, which I do understand, Your Honor, was the author of. Well, let me just say, first of all, in the time, we shorten it from 20 to 10. You know, maybe if you need more time, Judge Fragerson would agree to give you a little more. I certainly would be agreeable to that. But as to the Kaplan case, it's not that it's my opinion. It's the precedent of the Court. And this panel has no authority to disregard it. It would have to be an en banc court. So we can't really take another look at it. That's just the, you know, they didn't accommodate an as-regarded disability. It's just out under Kaplan, although you could write a petition for rehearing en banc on that issue. But we can't do anything about that. I don't believe. Okay. Well, again, in my supplemental authority, I did include the new Williams case out of the Third Circuit. And I did want to point that out, that the Williams case, in very systematic fashion, takes a look at the rationale of Kaplan, which was ultimately based on a case called Weber v. Strippett. No. I remember the case. But I'm just saying, even if you're absolutely right and some other case blows it out of the water and now we should change it, this panel can't do it. All right. We're not allowed to. A three-judge panel cannot alter a precedent of the Court. I understand what you're saying, and I acknowledge that. I do have a concern that, really, Kaplan did that in a way with respect to the Hooplahan opinion and ignored the Arline opinion. Someone would have had to have called that en banc. I will. I think we're wasting your argument time, so I don't mean to distract you, but I'm just trying to give you a hint. I don't think that will get you anywhere with this panel. Then, of course, the next question is sufficiency of the evidence in this case. Ultimately, that's where the Court ultimately hung its hat on in dismissing the case in this matter. I think we made sufficient proof that, in fact, she did suffer from a disability under the term of the Act, and I would ask the Court to look to the defendant's own witness, Dr. Mallon's testimony in that regard. Certainly they treated her as if she had a disability, and if you look at page 568 of the excerpts of record, there's a letter from a Captain Christensen, who was a physician's assistant operating under Dr. Mallon's licensure, indicating that, in fact, they perceived her as being a person subject to accommodation. There are factual issues. The record is replete with factual issues as to what was offered and the development of the accommodations that were, in fact, provided. We think we made a compelling case that the accommodations that were provided were inherently unreasonable and, in fact, mean-spirited and, I think, designed as a retaliation, which is a second issue, which is actually the fourth issue, with respect to whether the reprisal claim should have been dismissed on summary judgment, given the unreasonable. And here was kind of an interesting theory of the case, was that the unreasonable accommodation in and of itself was the reprisal here. They literally have her stuck in the men's shower room when it comes to a restroom facility, and there was some factual information indicating that there would have been a first-floor office available. At an earlier point in time, there was also substantial debate below as to whether or not there was actually a bona fide offer of a first-floor office or whether or not there was a theoretical office offered, and then there was no follow-up. The office was never prepared for her to return to. Judge, I think Your Honor raised an interesting question about the fact she was into retirement at one point in time, but it was always our theory of the case that the reason she went to a retirement situation was because the employer simply was not forthcoming. There was a deterioration in her mental condition, which was best testified to at time of trial, at least in part as a byproduct of the mistreatment she perceived herself as receiving at the hands of this employer. Once it came to these race and accommodation issues as well. These are difficult cases. Unfortunately, the bar has been set very high with respect to what is or isn't a disability covered under the Federal Rehabilitation Act and, of course, the American with Disabilities Act. But I think we made a compelling case that, in fact, she did have a sufficient disability here and that a moderate accommodation of simply providing her a first-floor office would have accommodated that disability in a humane and righteous fashion. Now, you've covered all this in your brief. If you don't want to hear from me, I will sort of sit here. I'll hear from you on and on and on and on, but we've gone, you know, I know what it's all about. I'm a lawyer, and that's my job is to try to keep talking and try to convince you to my side. All right. I can remember that. May it please the Court, Counsel. My name is Jamie Minnett, appearing on behalf of the government instead of Mr. Tad Seder, who was the trial attorney and who briefed the matter to the Court. Mr. Seder has left our office. Initially, to answer Your Honor's question, clearly in this case, Ms. Vaughn did not exhaust her administrative remedies. In this case, it's actually even beyond her not being timely. I mean, you are required within 45 days of any event that you believe is discriminatory, you're required to seek EEO counseling to start the process. What do you expect somebody to do when they try and the person they've made an appointment with doesn't show up? Does that count as substantial compliance? No, it doesn't, Your Honor. Ms. Vaughn, I mean, I believe you take every situation and circumstances may be different in other situations. Ms. Vaughn had been an EEO counselor. She was well aware of the requirements. Calling an individual that was on a list and not making contact with them is not complying with her obligation to go through the informal counseling. She had plenty of time within the 45-day period to contact another counselor and to continue attempting to do the informal counseling, even up until the time when she left the office in October. I mean, if she had complied and maybe perhaps it was late, we could say, okay, you made some initial efforts and it was difficult for you to do it, so, you know, maybe it was 30 days late or 60 days late. And that's one thing. She just totally ignored her responsibility to do it. She didn't do it at all, despite after going into the office in February wanting to file her formal complaint, being told that really she had totally ignored the informal process and that she needed to go through that first. She didn't do it. Now, Judge Bryan found that because the agency went ahead and investigated the case that they had waived their right to raise the issue that she hadn't complied. And with all due respect to Judge Bryan, it's the government's position that the agency should not be penalized for trying to resolve the case and investigating it. The law generally has been that as long as there's no finding of discrimination or no finding by the agency that the person was actually timely, that they haven't waived their rights to raise the issue later by investigating  and there are good reasons for doing that. Let's assume that we get to the merits. What's your response on the merits? On the merits of her appeal on the failure to accommodate claim? The whole issue here is whether or not the Army violated the Rehabilitation Act. Now, the government acknowledges that the Rehabilitation Act is a very important piece of legislation designed to assist people who are truly disabled, if they need the assistance, designed to help them compete and work effectively in the workplace. However, not everyone who has a medical problem is covered under the Rehabilitation Act. The threshold question for anybody is whether or not they're substantially impaired in a major life activity. And just having a problem, and there is no question that Ms. Vaughn had lupus, I mean, that is a medical condition, and perhaps under other circumstances that might be a disabling condition. It might down the road be a disabling condition for Ms. Vaughn. But the focus is at the time that they're actually asking for accommodation, in this case between March of 1999 and October of 1999, when she leaves the office and doesn't come back, the question is, at that time, is she substantially impaired in a major life activity? And I would submit to Your Honors, there is absolutely no evidence on the record that Ms. Vaughn was impaired in a major life activity. Her doctor's note merely said that because of her lupus and the swelling of her feet and that she experienced joint pain, that they should try to limit her climbing of stairs. Her doctor didn't even say that she can't climb stairs. It's just try to limit it. That's when we review all of the cases, and under the Toyota case, that does not rise to the level of a substantial impairment in a major life activity. Does the Toyota case standard apply here? Do ADA precedents apply to it? Yes, Your Honor. Right. The law is the Rehabilitation Act for federal employees, but the law says that the standards that are applied to the ADA apply to the Rehabilitation Act also. It's the same. And there is absolutely no evidence on the record that she was impaired. At trial, Ms. Vaughn focused on her dissatisfaction with the Army's attempts to try to work with her. She presumed, obviously, that because she had lupus, that it was a given that she was disabled. And she presented no evidence in any way to show that she was actually impaired in a major life activity. And, in fact, the evidence actually showed that she wasn't. I mean, she was functioning at work. She could work. She just had difficulty getting up and down the stairs. A lot of people have difficulty getting up and down stairs. And that in and of itself was not enough. So Judge Bryan correctly found at the end of plaintiff's case, taking all of the evidence in her favor, that there was absolutely no evidence that she was impaired in a major life activity and that she wasn't disabled. And that's, at that point, the end of the inquiry. There's no requirement to accommodate somebody under the Rehabilitation Act if they're not disabled. Now, granted, you know, we use the word accommodation in general terms, too. That doesn't mean to say that an employer isn't going to try to work with a person and try to help them, you know, if they have limitations that need to be helped. But there's no requirement legally under the Rehabilitation Act. And they can't say that they violated the Rehabilitation Act when Ms. Vaughn clearly was not disabled. And moving on to the retaliation issue. Again, we would submit to Your Honors that Judge Bryan correctly found summary judgment for a defendant on that issue. Initially, with retaliation, as you all well know, there has to be an adverse action. If there's no requirement to, if somebody's not disabled and there's no actual legal requirement to accommodate them, it's hard to say that a failure to accommodate them is adverse. And in any event in this case, there wasn't a failure. The Army was continually trying to work with Ms. Vaughn's limitations. Any time there was a different concern, they tried to work with her. There was no one at the Army that took an adverse action against Ms. Vaughn. And Judge Bryan correctly ruled that there was no connection between her complaints earlier on that some racial language had been used in the workplace and the ongoing efforts of the Army to try to resolve her problems. There was just no, there was no connection whatsoever. And really there was no, at summary judgment level, the plaintiff really did not present any evidence particularly on that subject at all. It was very conclusory. So Judge Bryan correctly ruled for the defendant on that issue. I really have nothing else. I would be happy to answer questions if the Court has any questions. But I would ask the Court to affirm the judge's ruling that Ms. Vaughn was not disabled. Thank you. Well, I have a question about your last sentence. I thought the government's position was that we shouldn't really, your preference is that we should say administrative remedies weren't exhausted. I do think that's. So you did not get to the disability. Exactly, Your Honor. I think that's a threshold question. The administrative remedies clearly were totally not exhausted here. Does the government recognize that there can be such a thing as substantial compliance with the procedural requirement? I'm not sure what substantial compliance is. I would imagine if somebody goes in and consults and sits down and talks, which is what is anticipated when you look at the regulations in an in-person discussion, and perhaps there may be a situation where at some point, whether it's at the informal stage or at the formal stage, the agency wants some information from the person, and the person might give so much but not as much as the agency wishes to have to try to resolve it. I guess there may be issues at that time, because if an individual thwarts the process, then the cases say that they've abandoned, and that's failure to exhaust. And that's probably where maybe a substantial compliance argument would come in and say, I gave you as much information as I had. You know, I substantially complied. You know, I gave you enough to go forward. But in this case, she just totally ignored that first step. She decided that she didn't. She made two attempts to contact a counselor, and then months went by, and then she left the agency in October. She was out, and after that she made no more attempts to go through the informal stage. And as I said before, Ms. Vaughan was previously had been an EEO counselor. She knows the regulations and what she's supposed to do, and she didn't do it. So that would be the first step, that the case should have been out totally. But regardless of that, I mean, if the court does not want to deal with that issue, the case can be affirmed on the grounds that she presented no evidence whatsoever to show that she was disabled. What's the, I guess, the technical theory that the district court, in your view, should have followed? In other words, is it giving like a summary, like a dismissal for failure to state a claim, or is it like a summary judgment on a statute of limitations? Like a dismissal for failure to state? I'm having a little trouble understanding. Generally, the failure to exhaust administrative remedies has been held not to be jurisdictional because it's subject to tolling a stop loan waiver. Right. So it's generally, you know, they find that they failed to state a claim when they did not go through with the, well, usually it's when they're not timely. In this case, when they totally abandon the process and don't follow it at all, I think there's almost a jurisdictional argument that could be made. But at the very least, it's a failure to state a claim on a failure to exhaust. Thank you. Thank you. We'll give you 58 seconds. That's all I'm really going to do, Your Honor. With respect to the exhaustion question, this is done on an abusive discretion standard. Judge Bryan did provide a very well-reasoned decision in his oral ruling on this matter, so the court does have to test these questions against that standard. With respect to whether or not there was a need for accommodation here and whether or not she did meet the standards of disability, I would respectfully suggest that just simply having the ability to have access to your job site where you conform the function to your job is an essential function of your job because if you can't get into the building, you can't perform your work. And here the question is, yes, maybe she can make it up those stairs, but she couldn't make it up those stairs without a substantial amount of pain. She also had a condition that made her bones brittle. She was on prednisone therapy to the point where her bones could spontaneously break at any time. Now, again, this law has a law about compassion and not callousness. With respect to, and again, this is a different case if we have it regarded as theory available to us. It becomes a much simpler case from our perspective as the plaintiff, and it makes a big difference. With respect to the retaliation claim, at some point I think it's a, I don't remember, I think it's called a metropolitan housing candidate out of our Supreme Court. When it comes to proof of improper motive, at some point in time you just have to ask the question, what happened? And what's a reasonable and proper explanation or plausible explanation as to the motivations behind what happened? And in this case when we look at what happened, there is an indication that there was a lot of unreasonable conduct on the part of her employers. They're putting her in the men's room, which is essentially a shower room, and putting her in a position of walking in on men disrobed and putting her in a disgusting work environment. Why would reasonable people do something like that? These are trained counselors dealing with people that are dealing with drug and alcohol problems. They're psychologists. They're intelligent and educated people. And yet they are treating Ms. Vaughn in this manner. Now, it could be retaliation. I have to, I reviewed the file in this case, and I reviewed the record. Unfortunately, that issue did not arise or really come out until time of trial. It was not developed at the summary judgment phase. So I can't rely on it. You see a lot of these bathroom facilities for both men and women. We have photographs in the record that you can look at that show you the staircase and the bathroom. They're in the excerpts of record. The bathroom itself was like four sinks, a number of stalls, and shower facilities for men. It wasn't just like, for lack of a better word, one of our smaller water closets. It didn't have a toilet. It had multiple toilet stalls. But it also had showers. It was the men's locker room. This was a former barracks. They put her in the men's locker room, essentially. At some point there was some kind of goofy deal where, well, you'll put your little sign up there. But she also was dealing with an unsanitary situation as well. The key issue, they went through this. Captain Christensen, in the letter that's set forth at, I believe, page 568, said that's not good. She's entitled to a sanitary bathroom. Not entitled, but the accommodation includes a sanitary bathroom because of her medical condition. She's on suppressive therapy because of the lupus. One of the things they do is they bring your immunity system down, because lupus is a type of disease where you have hyperactive immune systems. So they've got to suppress it. Then you put you into an unsanitary environment. Now, the key question came up later. The key question was, okay, this isn't going to work because of what Captain Christensen is saying. So we have office suites up here on the third floor where Mary also was office, Ms. Long, was also office. So we'll let her use an office. The managers have office suites with attached bathrooms or restrooms attached to them. Well, we'll let her use Jim Hill, one of the manager's offices, and Mr. Hill thereafter purposely refused to give her the key because he didn't like her for various reasons. That was in evidence through the testimony of Rhonda Knight. He purposely didn't give her a key to his office so she could have access to that rec room. So at one point you're creating this paper trail indicating we're doing this great thing for her. She gets to use the manager's office. On one hand, we're saying this, and on the other hand, they're saying the gentleman that's supposed to give her the key refused to do it. That's not reasonable accommodation under any set of facts, I would suggest. We've covered all of that, and we've given you a little bonus, too. I appreciate the court listening, and I hope the court finds this to be an interesting case. Thank you. All right. Thank you. We're going to take a break right now. See you later.
judges: Pregerson, Graber, Gould